**FILED**

**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**

2008 Aug 08 PM 02:29

CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
TOLEDO



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In Re: ) | Case No. 07-33081 |
| ) | |
| Gilbert C. Seeburger, Jr., and ) | Chapter 7 |
| Diane M. Seeburger, ) | |
| ) | |
| Debtors. ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 82] and Debtors' response [Doc. #85]. The court held a hearing on the motion that Debtors, Debtors' counsel and counsel for the UST attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will deny the UST's motion.

## BACKGROUND[1]

Debtors are married and have no dependents. Gilbert Seeburger is employed as a maintenance technician at the Toledo Museum of Art, where he has worked for nearly four years. Diane Seeburger ("Seeburger") formerly worked in the mortgage banking industry but, due to the downturn in the housing and mortgage markets, lost her job and has been unemployed since December 2006. Although she is working with three different employment agencies and has sent numerous resumés to potential employers, she has received no offers and remains unemployed.

In August 2005, at which time both Debtors were working and their household income was approximately $8,000 per month, they entered into a building contract for a 2,100 square foot, three bedroom home in Sylvania, Ohio, in the amount of $252,000. At that time, they owned and were living in a home in Michigan that was valued at $275,000; they planned to sell the Michigan property before completion of their new home. In the meantime, they were paying both the mortgage on their Michigan home and interest only on their construction loan for the new home. In July 2006, Debtors put the Michigan home up for sale, and their new home was completed in May 2007. Unfortunately by that time, they not only were unable to sell the Michigan home but Seeburger had lost her job at the end of 2006, resulting in Debtors' household income being cut approximately in half. In addition, Seeburger testified that, due to the decline in the housing market, the same house built by the same builder of their Sylvania home but with an additional $10,000 worth of amenities is now selling for only $211,000.

On June 18, 2007, Debtors filed for relief under Chapter 13 of the Bankruptcy Code. Their Schedule D shows total secured debt at the time of filing in the amount of $538,365, including $237,000 secured by their Sylvania home, a total of $256,365 secured by their Michigan home, $28,000 secured by a 2007 GMC Acadia, and $17,000 secured by a 2004 Pontiac Transport. In addition to the secured debt shown on Schedule D, a proof of claim filed by Osterman's Jewelers shows additional secured debt in the amount of $2,570.[2] Debtors' bankruptcy schedules also show unsecured nonpriority debts in the amount of $14,677, although the claims bar date passed in the Chapter 13 proceedings and proofs of claims filed by unsecured creditors total $6,564. Debtors' Schedule E shows no priority unsecured debt; however, in 2008, after filing their petition, they were assessed by the Internal Revenue Service ("IRS") additional income taxes in the

---

[1] In addition to the testimony and evidence offered at the hearing, the court takes judicial notice of the contents of its case docket and the Debtors' schedules. *See* Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990).

[2] The debt owed to Osterman's Jewelers was listed as unsecured debt on Debtors' Schedule F.

2

amount of $8,500 due to Seeburger's receipt of severance pay and unemployment benefits during 2007 for which there had been insufficient or no withholding of taxes.[3] The IRS has agreed to accept $275 per month until the additional taxes are paid in full.

At the time of filing, Debtors intended to surrender the Michigan property and jewelry secured by the Osterman's Jewelers debt, cure a $1,100 default owed to Erie Shores Credit Union for the 2004 Pontiac Transport and pay their unsecured creditors. To this end, they began making monthly Chapter 13 plan payments in the amount of $1,030. Also, in accordance with Debtors' amended Chapter 13 plan, the Michigan home mortgagee accepted a deed in lieu of foreclosure. Seeburger explained that, at the time of filing their Chapter 13 petition, her husband was receiving a substantial amount of overtime. This is reflected in Debtors' original Schedule I showing gross monthly income of $7,312. However, she testified that his overtime hours have since been significantly reduced as is reflected in their first amended Schedule I that shows a decrease in their gross monthly income to $5,351. [Doc. # 70].

According to Seeburger, Huntington Bank, successor of Sky Bank, the original mortgagee with respect to the construction loan for their Sylvania home, audited the records of the construction loans acquired from Sky Bank. Debtors were notified in late 2007 that their interest payments on the construction loan were calculated incorrectly and that there was a deficit of $4,100 owed by them. Although Huntington agreed to accept payments of $400 per month until the deficit was paid,[4] Seeburger testified that this, together with the drop in her husband's income due to a decrease in overtime, led them to file a motion to convert their case to one under Chapter 7.

On December 18, 2007, the court granted their motion. Since converting their case, Debtors have surrendered the motor vehicle secured by a debt owed to Erie Shores. According to Seeburger, Erie Shores sold the vehicle for $5,000, resulting in an unsecured deficiency of approximately $12,000 and, thus, total dischargeable unsecured debt of approximately $26,677. Debtors replaced that means of transportation with a GEO Tracker that they purchased for $500. Also after converting their case, Debtors filed an agreement with Huntington Bank purporting to reaffirm the debt secured by their Sylvania home.[5]

---

[3] Although Seeburger's employment was terminated in December 2006, she testified that she received part of her severance pay in early 2007.

[4] In light of the $8,500 income tax assessment by the IRS, Huntington later agreed to accept only $200 per month until the additional amount owed is paid in full.

[5] They did not, however, complete Part D of the agreement wherein they are required to set forth facts showing that the agreement will not impose an undue hardship on them and that they can afford to make the payments on the reaffirmed debt. Although their failure to complete Part D is noted on the court's docket, they have taken no action to complete this portion of the agreement.

3

Debtors' first amended Schedule I shows monthly income after payroll deductions in the amount of $4,157, which amount Seeburger agrees is and the UST accepts as accurate.[6] Debtors' second amended Schedule J shows total expenses in the amount of $4,094, including their increased home mortgage expense of $1,649, property tax expense of $305, and homeowners' association dues of $95. Although Debtors' mortgage payment increased after Huntington Bank audited their construction loan, Debtors' second amended Schedule J also shows that they engaged in considerable belt-tightening with respect to other expenses. For example, they decreased the following expenses as indicated: food expense from $600 to $200, clothing expense from $100 to zero, transportation expense from $500 to $200, recreation from $10 to zero, automobile installment payments from $1126 to $542.

Debtors' Form B22C calculating the means test in their Chapter 13 case shows that their current monthly income at the time of filing their case was $3,600 and that their annualized current monthly income was below the median income for a family of two in Ohio. After conversion of their case, Debtors filed Form B22A and an amended Form B22A calculating the means test applicable in a Chapter 7 case, both showing $3,600 as their annualized current monthly income. Although the UST initially filed a statement that Debtors' case is presumed to be an abuse under § 707(b)(2) based on his review of materials filed by Debtors, he later filed a statement that a motion to dismiss under § 707(b)(2) is not appropriate in light of the significant decrease in Gilbert Seeburger's income due to a decrease in overtime offered by his employer since Debtors filed their Chapter 13 case. [*See* Doc. ## 68 & 80]. Nevertheless, the UST filed a motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

## LAW AND ANALYSIS

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on July 18, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth

---

[6] Although Debtors filed a second amended Schedule I [Doc. # 76] approximately two weeks later showing gross monthly income of only $3,356 and income after payroll deductions of $2,461, there is no testimony or other evidence in the record explaining why this was filed or how this figure was calculated. However, as both Debtors and the UST accept the earlier figure set forth in the first amended Schedule I as the more accurate figure, the court also accepts the $4,157 figure as Debtors' monthly income after payroll deductions.

4

Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated its own version of this judicially created construct in § 707(b)(3) by requiring a court to specifically consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).[7]

The UST asserts two bases for dismissal of Debtor's Chapter 7 case. He contends that Debtors have been less than forthright with respect to reporting their income in their bankruptcy schedules and Form B22A and that their lack of candor provides a separate and independent basis upon which to find abuse. He also contends that the totality of the circumstances in this case show that Debtors are not needy and have the ability to repay a meaningful portion of their unsecured debt. As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that Debtors' case should be dismissed. *In re Gonzalez*, 378 B.R. 168, 172 (Bankr. N.D. Ohio 2007).

**A. 11 U.S.C. § 707(b)(3)(A): Lack of Candor/Bad Faith**

As discussed above, the Sixth Circuit explained in *Krohn* that substantial abuse under pre-BAPCPA 707(b) can be predicated upon a debtor's lack of honesty. *Krohn*, 886 F.2d at 126. In so determining, the Sixth Circuit explained that a court should ascertain from the totality of the circumstances whether a debtor is "merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings. *Id.* The Sixth Circuit articulated the following nonexclusive list of factors that may be relevant: (1) the debtor's good faith and candor in filing schedules and other documents, (2) whether the debtor has engaged in "eve of bankruptcy purchases," and (3) whether he was forced into Chapter 7 by unforeseen or catastrophic events. *Id.* In effect, this determination required courts to ascertain, as Congress has now expressly directed under

---

[7] As this court noted in an earlier opinion:
While Congress has clearly lowered the dismissal standard, articulation of what that change really means in decision-making in a particular case is a slippery enterprise at best. A totality of circumstances amounting to substantial abuse would obviously also amount to abuse. The converse is not necessarily true. Perhaps more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."
*In re Carney*, No. 07-31690, 2007 WL 4287855, *2, 2007 Bankr. LEXIS 4100, *7 (Bankr. N.D. Ohio December 5, 2007).

5

§ 707(b)(3)(A), whether the debtor filed his bankruptcy petition in good faith.

In this case, the UST notes that Debtors filed an original and two amended Schedules I, each stating a different amount as their monthly income. Seeburger explained the difference in the original and first amended Schedule I as being due to her husband's overtime hours being significantly reduced. Both the UST and Seeburger accept the figures in the first amended Schedule I as most accurately reflecting Debtors' monthly income at the time of the hearing on the UST's motion, which figures are consistent with Gilbert Seeburger's pay advices for his earnings in January and February 2008. Those pay advices show that he is still receiving overtime pay for approximately fourteen hours per week. According to Seeburger, he now receives overtime hours only when he replaces another employee who is sick or on vacation. No evidence was offered, and the court will not speculate, regarding the basis for the calculation of the monthly income reported on Debtor's second amended Schedule I.

The UST also points to reports by Debtors of their monthly income on Form B22A as showing their lack of candor in filing their petition and schedules. Debtors filed an original, amended, and second amended Form B22A, stating in each that their current monthly income is $3,600. "Current monthly income" is specifically defined to include the average monthly income that the debtors receive during the six-month period before filing. *See* 11 U.S.C. § 101(10A). The UST asserts that Debtors never earned an average monthly income of only $3,600 over any six month period. However, he offered no evidence or testimony in support of this assertion. Debtors' Schedule I and amended Schedule I do not require the calculation set forth in § 101(10A) and so do not alone provide evidence of Debtors' statutory current monthly income.

The UST does not suggest that Debtors engaged in "eve of bankruptcy" purchases. And Debtors' bankruptcy petition was filed in large part due to their household income being drastically cut as a result of Seeburger's unemployment in late 2006. Their first stop was not in Chapter 7. Rather, they filed a Chapter 13 petition and their Chapter 13 plan was confirmed.[8] Debtors surrendered certain assets and their Chapter 13 plan provided for payment of their unsecured creditors. Absent the later development of circumstances unforeseen by them, namely, a decrease in Gilbert Seeburger's overtime and a determination that the interest payments on their construction loan had been calculated incorrectly, Debtors' Chapter 13 plan would have provided a nearly 100% dividend to their unsecured creditors.

---

[8] In its order confirming Debtors' Chapter 13 plan, the court found that each requirement of 11 U.S.C. § 1325(a) had been met, [*see* Doc. # 51], which includes the requirement that Debtors filed their petition in good faith, *see* 11 U.S.C. § 1325(a)(7).

6

On these facts, the court concludes that the UST has failed to sustain his burden of proving that Debtors filed their petition in bad faith.

**B.  11 U.S.C. § 707(b)(3)(B): Totality of Debtors' Financial Circumstances**

The court must consider the totality of the circumstances in determining whether a debtor is "needy," that is, whether "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004).  The totality of the circumstances test allows the court to consider both prepetition and postpetition circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007); *In re Hartwick*, 359 B.R. 16, 21 (Bankr. D.N.H. 2007).  Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient under some circumstances to warrant dismissal.  *Krohn*, 886 F.2d at 126 .  Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through  private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27.

In this case, notwithstanding her efforts to find employment, Diane Seeburger has no source of income at this time after losing her job in the mortgage banking industry.  Gilbert Seeburger, on the other hand, enjoys a stable source of income.  Although he has experienced a decrease in his income due to fewer overtime hours being offered, there is no indication that he is in danger of losing his job.  There is, of course, no guarantee that the limited overtime hours that he is now receiving will continue at the same rate for the next three years.

Nevertheless, Debtors are eligible for Chapter 13 relief should they once again seek such relief as an alternative to a Chapter 7 discharge.  Notwithstanding Seeburger's unemployment, her husband's employment provides Debtors with regular, generally stable income and their debts are less than the statutory eligibility limits.  *See* 11 U.S.C. § 109(e).  Indeed, Debtors commenced this case seeking relief under Chapter 13.  However, due to the decrease in their monthly income and an unexpected increase in their expenses, they were unable to make the payments required under their confirmed Chapter 13 plan. Debtors' monthly income after their reported expenses as set forth on their amended Schedule I and second

7

amended Schedule J is only $63, and this is after significant belt tightening by them as addressed above. Debtors' schedules, and therefore this amount, do not take into account the additional income tax and mortgage interest obligations of $8,500 and $4,100, respectively, that they were made aware of after their petition was filed and for which they have agreed to pay $475 per month over and above expenses reported on their second amended Schedule J. The net result is that Debtors' monthly income is $412 short of what is needed to pay all of their monthly expenses.

Notwithstanding this shortfall, the UST asserts that if Debtors make reasonable adjustments to their budget, they would have the ability to repay their unsecured creditors. The question is - what is a reasonable adjustment? The UST presents two scenarios that he believes to be reasonable. In his motion, the UST recalculated Debtors' expenses, substituting for most of Debtors' actual expenses the IRS allowances utilized for purposes of determining disposable income under the means test. The UST's calculations under this scenario show that Debtors would have $584 of excess income per month, enough to pay all of their unsecured debt in less than thirty-six months. In a second scenario, the UST focuses solely on Debtors' housing expenses. He asserts that if the court accepts all of Debtors' stated expenses except their housing costs and allows as a reasonable housing expense 150% of the IRS housing allowance utilized under the means test, Debtors would still have sufficient excess income to repay 100% of their unsecured debt.

The UST cites no authority for, and the court finds no basis for accepting, his first calculation based on simply substituting on a nearly wholesale basis Debtors' actual expense amounts for the IRS allowances under the means test. The IRS allowances applicable under the means test set forth in § 707(b)(2) are not determinative in a § 707(b)(3) analysis. *See In re Kaminski*, 387 B.R. 190 (Bankr. N.D. Ohio 2008); *In re Talley*, 389 B.R. 741 (Bankr. W.D. Wash. 2008).

The court also rejects the UST's argument that a reasonable mortgage expense is *per se* no more than 150% of the IRS housing allowance under the means test. Even in determining whether abuse is presumed under § 707(b)(2), Congress placed no such limitation on debt secured by a debtor's home. Rather, in determining a debtor's disposable income under the means test, Congress specifically provided a deduction from current monthly income not only for the debtor's average monthly payments contractually due on secured debt during the sixty-month period following the date of filing the petition but also for any additional payments to secured creditors necessary for the debtor, in filing a Chapter 13 plan, to maintain possession of the debtor's primary residence. 11 U.S.C. § 707(b)(2)(A)(iii). The court finds no statutory basis and, on this record, no persuasive basis for lifting one expense amount from the means test (*i.e.* the

8

IRS housing standard) or some arbitrary multiple of that amount and ignoring related expense amounts that alternatively are allowed under the means test (*i.e.* actual mortgage expense). In the absence of any foundation explaining how the IRS standards were calculated, on what data they are based, or how current that data might be, the court finds the evidentiary value of the IRS standards regarding the reasonableness of Debtors' mortgage expense to be minimal at best in the totality of the circumstances analysis under § 707(b)(3). *See Harris v. United States Trustee (In re Harris)*, 279 B.R. 254, 261 (B.A.P. 9th Cir. 2002). Furthermore, the multiple of 150% of the IRS standard advanced by the UST must be based on some admissible evidence, and not on what amounts to the UST's, or, for that matter, the court's, own value judgments. *See id.*; *In re Marcoux*, 301 B.R. 381, 385 (Bankr. D. Conn. 2003). As one court concluded, "as a general rule, [a court] should not arbitrarily reduce Debtors' actual expenses for the purposes of projecting disposable income based on vague considerations of reasonableness, especially when surrender of property would necessarily follow from the reduction." *In re Payne*, 2005 Bankr. LEXIS 3135, *11, 2005 WL 4979063, *4 (Bankr. M.D. Ga. June 10, 2005).

The UST's argument does not address the reality of how these Debtors are to go about effectively reducing their housing expense at this time without generating more unsecured debt arising from a probable mortgage debt deficiency. That Debtors could reduce their housing expense is a point blithely argued but lacking in evidentiary context grounded in the totality of Debtors' actual overall financial circumstances. In contrast to the Michigan property, the Sylvania home is their principal residence and the Huntington Bank loan cannot be modified in Chapter 13. 11 U.S.C. § 1322(b)(2). Seeburger's testimony about Debtors' inability to sell the Michigan property, the termination of her employment in the mortgage industry and the current real estate market, in which a new home similar to the one they purchased but with more amenities could now be acquired for $211,000, shows that a reduction in their housing expense cannot realistically be effected at this time by sale of the residence for equal to or more than what they owe on it. Nor is there evidence demonstrating that Huntington Bank would accept a short sale or deed-in-lieu of foreclosure as non-bankruptcy alternatives to Debtors' ongoing payment of the debt owed; to the contrary, Huntington Bank has audited the loan and demanded that additional interest be paid, demonstrating an intent to collect all amounts owed. Thus the UST's argument in this case is, in essence, that because Debtors' mortgage and associated housing expenses exceed 150% of the IRS housing allowance, they should stop paying and default on their secured debt obligation to Huntington Bank in order to make funds available to pay their unsecured creditors instead. Given the accommodation Congress has afforded consumer debtors under § 707(b)(2) with respect to their accumulated secured debt, as well as the "totality of the circumstances"

9

analysis required under § 707(b)(3), the court finds that the UST's argument, applied in such a bright line manner, does not in this case advance the Congressional policies underlying prevention of abuse under § 707(b).

The court is not persuaded otherwise by the following cases cited by the UST in his motion and at the hearing on the motion. In *In re Felske*, 385 B.R. 649 (Bankr. N.D. Ohio 2008), the Chapter 7 debtors intended to continue paying the mortgage debt on a $390,000 home. In finding the debtors' $3,500 monthly housing expense unreasonable, the court considered whether any less expensive alternatives existed. While perhaps an appropriate consideration in light of the home the debtors sought to maintain, in almost every case, alternative housing of some sort that is less expensive is likely to be found. In this case, Debtors' home is valued at approximately one-half that of the home in *Felske*. As in this case, where the debtors do not live in a luxury home, the court does not find consideration of less expensive alternatives particularly relevant.

In *In re Mooney*, 313 B.R. 709 (Bankr. N.D. Ohio 2004), the court dismissed the case as a "substantial abuse" under pre-BAPCPA § 707(b). To be sure, the court considered the debtors' monthly mortgage payment of $1,759 for a home that the court stated was valued "in the upper echelon of homes in the area." *Mooney*, 313 B.R. at 714. However, in finding substantial abuse, the court found it more significant that the debtors' schedules revealed no other sacrifice to make a nicer home economically feasible. *Id.* at 715. The court considered not only the debtors' mortgage payment but the totality of the circumstances and concluded that "[t]hese are not financially and occupationally hampered debtors who have fallen on tough times and desperately need a fresh start." *Id.* Rather, "[they] had decided to live at or just beyond what their means will allow and have used their unsecured creditors to help accomplish this." *Id.*

*Mooney* is distinguishable from this case where Debtors' financial difficulties are due, almost entirely, to the decline in the housing and mortgage markets, which directly and negatively affected Seeburger's employment and employability as well as Debtors' planned management of their debt through the sale of their Michigan home. This is not a case in which Debtors were living or seeking to live beyond their means when the financial decisions that are the crux of this case were made and then embarked on the *modus operandi* of using their unsecured creditors to allow them to do so. Unlike *Mooney*, Debtors have engaged in significant belt tightening and have attempted, albeit without complete success, to address their financial difficulties in a Chapter 13 case. As an example, Debtors have substituted a $500 GEO Tracker for a 2004 Pontiac Transport encumbered by $17,000 in debt that required monthly payments of $584.

Similarly, the court finds *In re Depellegrini*, 365 B.R. 830 (Bankr. S.D. Ohio 2007), which the UST characterizes as factually similar to this case, to be distinguishable. In that case, in finding abuse under § 707(b)(3), the court did not base its decision on the fact that the debtor's mortgage payment of $1,600 was unreasonable but, rather, it considered the totality of the circumstances, including that foreclosure was inevitable because debtors were unable to make their mortgage payment for the six months before the hearing. *Depellegrini*, 365 B.R. at 832. The court also found the debtor's explanation of the cause of his financial situation, that he was trying to give his two adult sons the same lifestyle they had before his divorce, did not weigh against dismissal. *Id.* at 833.

Unlike *Depellegrini*, the UST does not suggest that foreclosure is inevitable, and the court notes that relief from the automatic stay has not been sought in connection with Debtors' home. And unlike *Depellegrini*, Debtors' financial woes were not caused by an attempt to indulge in a lifestyle they could not then afford. Rather, they were literally caught in the middle of the mortgage and housing industry crisis, a situation that significantly affected both the income and expense side of their household financial equation, forcing them to seek bankruptcy relief.

Debtors are not trying to retain a luxury home and, in fact, they have surrendered the higher valued Michigan home. They have engaged in considerable belt tightening and the court does not believe that a further reduction in their expenses is warranted on the record in this case. Considering the totality of the circumstances, and for all of the reasons discussed, the court does not find that granting Debtors a discharge in this case would be an abuse of the provisions of Chapter 7. A separate order denying the UST's motion to dismiss will be entered by the court.